24-10068 Joseph Heid v. Mark Rutkoski It looks like we're missing council, so we'll wait a couple minutes. He's here, I think. He's not here. He's not here. Good morning, Brian Mose on behalf of the appellants, Mark Rutkoski and Forrest Best. Throughout the argument, I will refer to them as appellants or deputies. There are two issues or two arguments that we have made that we believe support a finding that the district court erred in denying qualified immunity to the deputies. They concern the video evidence that was introduced into the record, argued on summary judgment by both sides. Second, we argue that the district court made an error in narrowing its construction and interpretation of the totality of the circumstances analysis to focus exclusively on the few seconds when Mr. Heid exited from the home and the deputies had to make a use of force decision. Now, I appreciate the court's remarks. The panel is informed of the facts of the case. It's not my intention to review thoroughly those facts, but I do believe it is important to context to understand that the deputies were engaged with Mr. Heid for 45 minutes and the climactic events that occurred here transpired within 45 seconds. I have a question before you get to that. Do we have jurisdiction in this case? Is this case about something other than an agreement or disagreement with what the facts show? I don't believe so, Your Honor. I believe jurisdiction is proper because we are dealing with two issues that go to the core elements of qualified immunity, particularly the standard by which the lower court applied the totality of the circumstances. In this particular instance, the district court excluded from the analysis the entirety of the event, the entire 45 minutes of the police encounter, which would have informed the objective beliefs of a reasonable officer in the shoes of the deputies. Instead, the district court focused exclusively on the three to five seconds when Mr. Heid appeared in the doorway and exited from the home. I believe that is an unnatural and unprecedented view of the totality of the circumstances analysis, and I believe that it is unfair to the deputies for their quick, sudden decision-making in a dangerous, intense environment to be determined by their judgment within a matter of three seconds. Now . . . We have cases like Robinson where we've said once the person becomes no longer a threat, then the use of force may not be justified. Why is this case different from those cases? Well, in the Robinson case was distinguished because in that instance, the subject of the use of force was incapacitated and was no longer capable of threatening that the officers were performing the arrest. This case is distinguished because there is no record evidence that the deputies knew that Mr. Heid was unarmed or that he had disarmed. Remember, Mr. Heid committed attempted second degree murder of a fellow deputy within 45 seconds of my client's, the deputy's, use of force decision. They don't know that. They know there was shooting in the backyard. I think an objectively reasonable officer at the front of a home who was observing and hearing 40 gunshots, six of which include the firing of a long gun, would know. Would you say that your argument is even assuming that the court accepts the contention that Mr. Heid was holding his arms out like this, that even if you assume that that was true and that that is consistent with the video, that that would not have alerted the officers that he was unarmed and no longer a threat? My argument is that the objective facts of this case would demonstrate that Mr. Heid's conduct, his errant conduct, his homicidal conduct, would have been viewed very suspiciously by any deputy who engaged him suddenly as he exited from the home in the manner in which he exited the home. This is where I believe the court... That's what my question is, though, because if there's a dispute over the manner in which he exited the home, then at this stage of the case, we have to assume that Mr. Heid's version of the facts is true. What I'm asking is, even if you assume that his version is true, do your clients win? Yes. Okay. Walk me through that. Well, first of all, I have to remark that the error of the district court was not a sufficiency of the evidence. It was a disregard of the video evidence, and by that I mean within the order, there is not a single mention of the video evidence that both parties submitted was material and relevant to the case. Court was absolutely silent in its ruling as to the significance of that video, and it is the contention of both sides that that video does depict material evidence. In certain respects, that video is unambiguous. It is clearly unambiguous where it evidences an open door with Mr. Heid exiting through it at an excited, energetic pace, swinging his arms, wherein he shot within two to three seconds. The failure of the district court to consider that competent evidence that was put forward compounded the error made in the court's evaluation of the totality of the circumstances. Perspective is everything, and the court unnaturally narrowed the view of the record evidence to a three-second period of time within a 45-second period in which there were numerous gunshots fired. So the court ruled that based on the plaintiff's version of the facts, he posed no risk to  Well, I would disagree with that, and I believe the court was in error because an objective deputy in the scene would not know whether Mr. Heid had rearmed. He was known to have numerous guns inside the house. He was not known to have moved through the house. He appeared suddenly in the house. He appeared at the doorway seconds after the gunshots were in the backyard, and the deputies knew in that moment Mr. Heid was actively resisting because commands had been given to him in the backyard to surrender. He ignored those commands, and he appeared seconds later in the doorway and energetically exited the doorway and came within two to three feet of the deputies before they shot. I would submit that every reasonable person in that situation would feel a real present threat of serious injury and harm. The use of force in this instance was objectively reasonable. May it please the court. My name is Roderick Ford, and I represent the appellee Joseph Heid. The basic objective of my presentation is to demonstrate why the district court's order denying the appellant's motion for summary judgment on grounds of qualified immunity should be affirmed. Fundamentally, the appellant's arguments have misconstrued the material facts of this appeal and does not reflect Rule 56 summary judgment jurisprudence regarding qualified immunity and excessive force as adopted in this circuit. For example, this court has routinely and repeatedly held that material facts which are accepted at the summary judgment phase in the summary judgment proceedings may not necessarily be the actual facts which are eventually argued at trial. I agree with you about that standard. What is your version of the facts that supports the court's summary judgment? Thank you for that question. The question of fact in these types of cases is significant because the key is what is clearly existing law to give the police officers fair warning. That is the critical analysis of the material facts. I agree, but what is your version of what happened when he left the house? So the police officers had fair warning when you look at the totality of the circumstances in this case. As stated in the district court's order granting or denying the motion for summary judgment, it clearly sets forth a set of facts and the response . . . Counsel, our job is to take the facts and lean them over in the favor of the plaintiff, so taking all the facts and the inferences in the favor of your client, Judge Brandt was asking you what are the facts. When you do that, forget what the district judge said. What are the facts from the evidence that take it in the light most favorable to your client? Thank you very much, Your Honor. I understand fully the question, but if Your Honors will indulge me, I'm going to answer that question. So the facts have to be taken into context as to what the officers . . . what's reasonable under the circumstances. That is the fundamental question. In this case, there was a gunfight in the back of the house. My client has alleged the whole time that the police officers shot at him in the back of the house, and he did not know who they were. Twenty-seven seconds later, he walks through his house to the front of the house and comes out with his hands up saying, I give up, I'm unarmed, and at that point, he is immediately shot. I think that the contention was not that his hands were up, right? Not up like this, but more like this. Was I mistaken that that was your position? The videotape speaks for itself. There's a genuine issue of material fact. That is the critical point. I understand. I'm asking you what you have told us is the best interpretation of the video. My understanding was that you said that the video was that he was holding his hands out, not that he was holding his hands up. Now, maybe it doesn't matter, but I just want to make sure I understand what you have told us. Well, the video should go to a jury, and the jury should decide. But that's not... The video shows... Sir, please, that's not my question. My question is what you told us. Did you say his hands were up or that they were out? Well, in my response brief on pages 12 and 13, I quoted what was testified to in the deposition, so I did not give my own interpretation. I quoted Mr. Hyde's description as to what he did as he was exiting the house. Okay, and what was that? So, on page 12 of the response brief, I'm sorry, on page 12 of the response to the motion for summary judgment, Mr. Hyde, in his own words, says, when I was at the front door, there was no gunfire, so it stopped somewhere between that time. I'm unarmed, I ain't got no firearms, I'm coming out. My hands are in front of me, so I'm coming out. I'm unarmed, so I'm walking. I give up, I'm unarmed, I give up, I give up, I surrender. I'm coming out, I'm moving, and I'm still yelling, my hands are in front of me. That's the first thing you're going to see, my empty hands. Now, I know who they are, and I can actually see that they are law enforcement. There's two of them, I can see them, so Ratosky, from right there, pop, pop, he shoots me in my leg, so I turn my back to him, and he shoots me again. I kept reiterating, I'm unarmed, Hyde has shot me, Hyde was shot six times, and this is his testimony, left thigh, left ankle, left inside thigh, the groin region, and twice in the lower left back. This is Mr. Hyde's own description of what happened. This was in the motion for summary judgment, and the district court correctly relied upon that testimony as the most favorable scenario of facts in the record. Obviously, the appellants have their version of the fact, but as a matter of law, this court is duty-bound, as it has held in the case of Hunter v. Leeds, which I believe is on all fours, Hunter v. the City of Leeds, which I believe is on all fours, is a 2019 case. This court is duty-bound to consider the version of the facts as more favorable to the non-movement. The district court applied the correct standard, basically adopted Mr. Hyde's version of the  The video does not refute Mr. Hyde's version of the facts, and this is critical. Because the video does not refute Mr. Hyde's version of the facts, there is a genuine issue of material facts. This court is duty-bound to accept the more favorable version of the non-movement. Therefore, this court should reject the appellant's contention that the video somehow gets them to where they need to be in terms of a denial of qualified immunity. We have a case called Franklin v. Popovich, and I was on the panel in that case. In that case, we concluded that qualified immunity was appropriate where an officer shot a suspect because the underlying crimes were serious violent felonies. The person had shot at officers, and there was no evidence that the officers knew that the person was unarmed. How is this case different from that one? This case is different because it is clear in this circuit that while during a police encounter, the use of deadly force, and this is what we have in this case, the use of deadly force can be justified in the beginning, but it can also rapidly change during the course of that encounter in a matter of seconds, and that is what has happened in a different case that this court resolved, which was Hunter v. City of Leeds, a 2019 case in which the facts in that case are very similar to the facts in this case. The facts in that case, it started out with a domestic altercation. The police officers approached the suspect while he was in his car. The suspect sped off. There's a conflicting testimony in terms of what the police officers said happened at that point and what the suspect said happened at that point. The suspect sped off to his house, drove into the parking carport. There was a four-car police chase. One of the deputies got out, testified that he thought he saw the suspect with a gun. There was a first volley of shots based on that testimony, but the suspect testified that he heard the officer say, drop the gun. Split second, he drops the gun. Nevertheless, the officer unloads the second volley of shots, shooting the suspect several times, and so based on that series of events, this court held that the police officer was not entitled to qualified immunity because he should have known at that point that once the suspect dropped the gun, there was no justification for the continued use of deadly fire. That's what happened in this case. Does Mr. Hyde deny that he shot at the officers in the backyard? Yes, he does. I believe that there's a collateral estoppel argument that the appellants have set forth, just as there was a collateral estoppel argument in the Hunter case, but I believe that this court has held that as long as the suspect is arguing facts that are not diametrically opposed to the conviction itself, they can certainly make such arguments in order to bring context to the case, and that is what Hyde has done in this case. Mr. Hyde has two, three, 3850 motions in the state court pending where he's challenging the events that happened in the back of the house. I know that's the subject of another court, but he is challenging the events that happened in the back of the house. There is indeed a genuine issue of material facts. Before I forget, Mr. Hyde, according to the record, 27 seconds from the time Mr. Hyde left the back of the house and walked to the front of the house, that is a long time for the events to have de-escalated under qualified immunity jurisprudence. That's a very long time. There is also, in this case, there's standard operating procedures, Orange County Sheriff Office policy and procedure 8.1.0, which governs the use of deadly force, and that policy specifically forewarns officers that before they can use deadly force, they must give adequate warning and give the suspect an opportunity to comply before they can use that force. Why is that important? Well, in order to overcome qualified immunity, the suspect has a burden to show that there's clearly established law, and that can be done through case law, and we're saying that Hunter v. City of Leeds is our case law because it is on all fours from our perspective, and we would like for the court to adopt that. And then the other method is where there's extraordinary circumstances. There can be extraordinary circumstances, and we believe that when you take into account the fact that there's a standard operating procedure, and there's a video clearly showing that Mr. Hyde was unarmed, and that the police officers did not follow the standard operating procedure, that constitutes sufficient extraordinary, additional extraordinary circumstances to justify overcoming the defense of qualified immunity in this case. And with that, I'll rest. Thank you. Thank you. The facts of the Hunter v. Leeds case are not even close to the facts that the deputies or the situation that the deputies encountered here. In Hunter, the suspect did not shoot upon the deputy or the officer. In Hunter, the officer witnessed the suspect disarm. The suspect testified that he disarmed at the command of the officer, so he threw the gun out the window. Is there a genuine issue of material fact whether Mr. Hyde shot at the officers in the backyard? None. That aspect of the collateral estoppel doctrine was not appealed by the appellee. We have not challenged the correctness of the district court's finding of collateral estoppel. Okay, but setting aside collateral estoppel, did Mr. Hyde testify that he did not shoot at the officers in the backyard? Mr. Hyde testified that he never handled the gun. He does not know how the gun got to the backyard. He cannot explain the six shell casings matching the gun in the backyard. He denied it. He denied it. The court inquired about the Popovich decision. In that case, it has some facts that are very similar. I would remark that what is also important are facts that are not known. What was not known in this instance is whether or not Mr. Hyde disarmed. There is no evidence that he was witnessed to have dropped or disarmed that gun voluntarily. So within the three to four seconds in which those deputies had to make a use of force decision, they are acting according to their training to assume that he either continued to possess a weapon or he rearmed himself as he moved through the home where he was known to keep weapons. If Mr. Hyde wished to surrender, how could he have done it in a way that would not present the sort of risk the deputies are claiming? Again, the deputies engaged Mr. Hyde for 45 minutes. The record is undisputed that he was commanded out of the home by a PA assistant from Deputy Ratusky. Mr. Hyde in the rear yard was given audible commands by Deputy Sanchez to show his hands and get to the ground. Those commands were given in the rear yard. Twenty-seven seconds later, Mr. Hyde's at the front door. That would be evidence that he is clearly resisting the lawful commands of Deputy Sanchez to get to the ground in the backyard where he could have been safe. Do the guys at the front door know about the command in the back about getting down? They hear the testimony records. They listen to each other on wire and whatnot. What do they know about what you just said in the back? They can draw on their ... An objectively reasonable officer would draw on their training. Their training would trigger an automatic command to get to the ground and show hands. So the guys in the front know that he's been told in the back to get down? The deputies hear the commands shouted.  Correct. They hear commands shouted or given in the backyard. They're training ... They hear any shots after that? Correct. They do? They hear shots. The first shot is initiated where the first shot has a distinguishing signature of a rifle. That's after the command? Correct. Well, there are many commands given. Well ... Come out of the home ... The get down command. Correct. The get down command is given and that is documented within the FDLE report that is part of this particular record in the testimony of Deputy Sanchez. Did the officers in the front testify that they specifically heard and understood the there were commands and they would have expected that one of those commands would be get down? They heard commands, indiscernible, given to Mr. Hyde in the backyard. Their training would have informed them that the commands were to get to the ground, be submissive, and negate the need for force. It would have been an automatic, reflexive thought that a reasonable deputy would have had in that situation. I do want to ... Whatever the case, they know he did not go down. They know he did not go down. Because he's at the front door.  He appears suddenly at the front door. And this is why I think the video evidence removes all doubt as to the threat presented by Mr. Hyde. You hear the commands. The commands are given. You hear a barrage of gunfire. Twenty seconds later, approximately, Mr. Hyde suddenly appears in a door. Now, the video blatantly contradicts Mr. Hyde's testimony. Mr. Hyde testified that he moved through the home, from the rear of the home to the front of the home with urgency. He stopped at a closed door. He shouted outside into the front yard, I'm coming out, I'm giving up. He then testified he opened the door and slowly walked into the front yard, whereupon he was fired upon. That is blatantly contradicted by the record evidence. Now, I would agree that the video does not capture in detail the entirety of the encounter, which is why, for purposes of our argument made below and here, we do not contest the testimony of Mr. Hyde or create an issue of Mr. Hyde as to his uttering the statements that he's giving up and coming out and that he is disarmed. But the case law in this district and elsewhere would inform the deputies that they, under those circumstances, again, 20 seconds or so after an attempted murder, that they would not necessarily believe Mr. Hyde's statements as being genuine or sincere, given the level of hostility in the presence, in the continued observation of resistance to the law enforcement's command. Zero sign of submission, zero sign of giving up. I do want to make one quick remark regarding the sufficiency of the evidence Mr. Hyde did touch on. I believe the video evidence is peculiar evidence. It is, as Mr. Hyde said, the video speaks for itself. Upon de novo review, this court does not need to make credibility determinations. It simply needs to look at the video and discern what is objectively observable and incorporate that into the totality of circumstances analysis required. We believe the district court made an error not considering the video, not mentioning the video, and we believe that the district court erred in unnaturally limiting his analysis of the totality of the circumstances to plaintiff's testimony within those four seconds. The deputies respectfully request this court reverse the order denying qualified immunity. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.